## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| LAURA ROSSANO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>BRAMAN HYUNDAI, INC., a Florida corporation, MAJOR ADVERTISING LLC, a Florida Limited Liability Company, and THE STRATICS GROUP, INC., a foreign corporation,<br><br>Defendants. | CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

---

## CLASS ACTION COMPLAINT

Plaintiff Laura Rossano ("Plaintiff"), files this Class Action Complaint against Defendants Braman Hyundai, Inc. ("Braman"), Major Advertising LLC ("Major"), and The Stratics Group, Inc. ("Stratics") (collectively, "Defendants") and alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys and publicly available information.

### NATURE OF THE ACTION

1. Defendants violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*, ("TCPA"), by making unsolicited prerecorded telemarketing calls[1] in violation of consumers' privacy rights.

---

[1]  The term "call" is not defined by the TCPA.  *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953 (9th Cir. 2009).  "Webster's defines 'call' . . . as 'to communicate with or try to get into communication with a person by a telephone.'"  *Id.* at 953-54 (citing *Webster's Third New International Dictionary* 318 (2002)).

2.     Braman – one of the largest automotive retailers in South Florida – knew that it was prohibited by the TCPA from contacting consumers on their cellular telephones with prerecorded marketing calls, without their prior express written consent.

3.     Nevertheless, in an obvious attempt to circumvent the TCPA, Braman purchased private personal contact information of South Florida consumers from Alesco Data Group ("Alesco"),[2] a grey-market data broker, and directed Major to transmit unsolicited "ringless"[3] voicemails to Plaintiff and approximately 62,000 other consumers to promote its dealership.[4]

4.     Put simply, Braman's marketing model of purchasing private consumer data from the grey market and then placing unsolicited marketing calls to those consumers is exactly why Americans received 48 billion robocalls in 2018, or 1,500 robocalls per second.[5]  It also finally answers the age-old question: "how did that marketer get my cellphone number?"

---

[2]    Disturbingly, Alesco advertises its ability to obtain even the most sensitive consumer data such as the home address, VIN number, vehicle style, and lease expiration date for a consumer's vehicle. For a price, Alesco will even confirm whether that consumer has a child present at the home.  *See* Alesco Data, Automotive Database, http://www.alescodata.com/data/automotive/ (last visited June 5, 2019).  Alesco also boasts about its ability to obtain other consumer data such as date of birth, occupation, intention to buy a vehicle, marital status, education, credit card issue date, political party, whether a consumer is a pool owner, divorce date, home equity, channel preference, income, credit rating, and insurance renewal month.

[3]    The term "ringless" was coined by companies that peddle this technology, and is false.  It is common knowledge that every cellular telephone audibly alerts a consumer when a voicemail is received by default.

[4]    Like all federal statutory tort actions, the TCPA incorporates vicarious liability principles, including actual and apparent authority, and ratification.  The FCC has made this point explicitly, recently stating that a seller "may be held vicariously liable under federal common law agency principles for a TCPA violation by a third-party telemarketer."  *See In re Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois, N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 FCC Recd. 6574, ¶ 24 (FCC May 9, 2013) (hereinafter "*2013 Dish Network Order*").

[5]    *See* Octavio Blanco, *Mad About Robocalls,* Consumer Reports (Apr. 2, 2019), https://www.consumerreports.org/robocalls/mad-about-robocalls/.

5.     The self-proclaimed inventor of the ringless voicemail technology utilized by Defendants – Stratics – not only flaunts the ability of its technology to invade the privacy of consumers, but also consumers' inability to stop the invasion of privacy caused thereby, on its website:[6]



Nobody Is Unreachable
The Ringless Voicemail Drops Revolution Has Arrived!

6.     Through this action, Plaintiff seeks to hold Defendants accountable for their flagrant violations of the TCPA, and for violating the privacy of thousands of consumers.

7.     Plaintiff, for herself and a Class of similarly situated individuals, seeks relief to halt Defendants' unlawful conduct.  Plaintiff also seeks statutory damages on behalf of herself and members of the Class, and any other legal or equitable remedies to redress Defendants' violations of the TCPA.

**JURISDICTION AND VENUE**

8.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, given Defendants' alleged violations of a federal statute.  This Court also has subject matter jurisdiction pursuant to the U.S. Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (d)(6), because there is diversity of citizenship and the claims of individual Class members, in the aggregate, exceed the jurisdictional minimum of $5,000,000, exclusive of interest and costs.

9.     Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants are deemed to reside in any

---

[6]     *See* Statistics Networks, https://straticsnetworks.com/ringless-voicemail-drops (last visited June 5, 2019).

judicial district in which they are subject to the court's personal jurisdiction, and because Defendants provide and market their services within this District, thereby establishing sufficient contacts to subject them to personal jurisdiction. Further, Defendants' tortious conduct against Plaintiff and other members of the Class occurred within the State of Florida, thereby subjecting Defendants to jurisdiction in the State of Florida.

## PARTIES

10.    Plaintiff is a natural person who, at all times relevant to this action, was a citizen of the State of Florida residing in Miami-Dade County, Florida.

11.    Braman is a Florida corporation with its principal place of business located at 2060 Biscayne Blvd., 2nd Floor, Miami, FL 33137.  Braman directs, markets, and provides its business activities throughout the State of Florida.

12.    Major is Florida limited liability corporation with its principal place of business located at 500 Three Islands Blvd., #518, Hallandale Beach, FL 33009.  Major directs, markets, and provides its business activities throughout the State of Florida.

13.    Stratics is a Delaware corporation with its principal place of business located at 303 Williams Ave. SW, Ste. 821, Huntsville, AL 35801.  Stratics directs, markets, and provides its business activities throughout the State of Florida.

## THE TCPA

14.    The TCPA prohibits: (1) any person from calling a cellular telephone number; (2) using an automatic telephone dialing system or an artificial or prerecorded voice; (3) without the recipient's prior express consent.  47 U.S.C. § 227(b)(1)(A).

15.    Accordingly, the TCPA exists to prevent communications like the ones made by Defendants that are at issue in this Complaint.  "Voluminous consumer complaints about abuses of telephone technology—for example, computerized calls dispatched to private homes—

4

prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370-71 (2012).

16.     In an action under the TCPA, a plaintiff must only show that the defendant "called a number assigned to a cellular telephone service using an automatic dialing system or prerecorded voice." *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012), *aff'd*, 755 F.3d 1265 (11th Cir. 2014).

17.     The Federal Communications Commission ("FCC") is empowered to issue rules and regulations implementing the TCPA.  According to the FCC's findings, calls in violation of the TCPA are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.  The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.  *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278, 18 FCC Rcd. 14014, 14115 (FCC July 3, 2003) ("*Rules & Regulations I*").

18.     In 2012, the FCC issued an order tightening the restrictions for automated telemarketing calls, requiring "prior express ***written*** consent" for such calls to wireless numbers. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278, 27 FCC Rcd. 1830, 1838 (FCC Feb. 15, 2012) (emphasis supplied).

19.     To obtain express written consent for telemarketing calls, a defendant must establish that it secured the plaintiff's signature in a form that gives the plaintiff a "'clear and conspicuous disclosure' of the consequences of providing the requested consent… and having received this information, agrees unambiguously to receive such calls at a telephone number the [plaintiff] designates." *Id. at* 1837-38, 1844, 1857-58.

20.    The TCPA regulations promulgated by the FCC define "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services."  47 C.F.R.  §  64.1200(f)(12).  In determining whether a communication constitutes telemarketing, a court must evaluate the ultimate purpose of the communication.  *See Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 820 (8th Cir. 2015).

21.    "Neither the TCPA nor its implementing regulations 'require an explicit mention of a good, product, or service' where the implication of an improper purpose is 'clear from the context.'"  *Id*. (citing *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012)).

22.    "'Telemarketing' occurs when the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services."  *Golan*, 788 F.3d at 820 (citing 47 C.F.R. §§ 64.1200(a)(2)(iii) and (f)(12); *Rules & Regulations I*, 18 FCC Rcd. at 14098.

23.    The FCC has explained that calls motivated in part by the intent to sell property, goods, or services are considered telemarketing under the TCPA.  *See id.* at 14097-99.  This is true whether call recipients are encouraged to purchase, rent, or invest in property, goods, or services during the call *or in the future*.  *Id*.

24.    In other words, offers "that are part of an overall marketing campaign to sell property, goods, or services constitute" telemarketing under the TCPA.  *See id.* at 14097.

25.    If a call is not deemed telemarketing, a defendant must nevertheless demonstrate that it obtained the plaintiff's prior express consent.  *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-2778, 30 FCC Rcd. 7961, 7991-92 (FCC June 18, 2015) ("*Rules & Regulations II*") (requiring express consent "for non-telemarketing and non-advertising calls").

26.     As recently held by the United States Court of Appeals for the Ninth Circuit: "Unsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients. A plaintiff alleging a violation under the TCPA 'need not allege any **additional** harm beyond the one Congress has identified.'" *Van Patten v. Vertical Fitness Grp.*, 847 F.3d 1037, 1043 (9th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) (emphasis in original)).

## FACTS

**Braman's Relationship with Major**

27.     The subject prerecorded calls were sent by Major through the use of a "ringless" calling platform provided by Stratics, at the direction and under the control of Braman.

28.     Prior to transmitting the subject prerecorded calls, Major consulted with Braman as to the content of the messages, and always received final approval to transmit the prerecorded messages from Braman.

29.     Although Major was responsible for ultimately transmitting the subject prerecorded messages, Braman always retained the right to change or add something to the content of the messages.

30.     At all times relevant, Braman had the right to control Major's telemarketing activities, which right it exercised.

31.     At all times relevant, Braman authorized Major to use its name in the subject unsolicited prerecorded messages.

32.     Braman was, at all times relevant, aware of Major's marketing activities and violations of the TCPA.

33.     Stratics was, at all times relevant, aware of Major's marketing activities and violations of the TCPA.

34.     Major's and Stratics' acts complained of herein were known, consented to, and/or ratified by Braman. Further, Braman knowingly received and retained monetary benefit from Major's unlawful calling and telemarketing practices alleged herein.

35.     Major's reliance on Stratics to transmit the subject prerecorded messages was known, consented to, and/or ratified by Braman.  Further, Braman knowingly received and retained monetary benefit from Major's use of the Stratics platform.

**Defendants' Marketing Calls to Plaintiff and Class Members**

36.     In January 2017, Major launched the first prerecorded call campaign on behalf of Braman, which consisted of approximately 4,100 calls.

37.     To record the first prerecorded message, an employee of Braman was instructed by Major to call a number and record the message over the phone.

38.     Additionally, Major Advertising provided a script to Braman on how to handle inbound calls from recipients of the prerecorded calls.

39.     Over the course of the next ten months, Defendants sent prerecorded marketing calls, through the Stratics platform, to members of the Class on the following dates: (a) January 16, 2017; (b) February 7, 2017; (c) February 8, 2017; (d) February 9, 2017; (e) February 10, 2017; (f) March 16, 2017; (g) March 17, 2017; (h) March 18, 2017; (i) March 19, 2017; (j) March 20, 2017; (k) March 21, 2017; (l) April 17, 2017; (m) April 18, 2017; (n) May 23, 2017; (o) May 24, 2017; (p) July 12, 2017; (q) July 13, 2017; (r) July 14, 2017; (s) July 15, 2017; (t) July 17, 2017; (u) July 18, 2017; (v) August 24, 2017; (w) August 25, 2017; (x) August 26, 2017; (y) August 28, 2017; (z) September 27, 2017; (aa) September 28, 2017; (bb) September 29, 2017; (cc) September

8

30, 2017; (dd) October 20, 2017; (ee) October 21, 2017; (ff) October 23, 2017; and (gg) October 24, 2017.

40.     Braman, through Major and Stratics, transmitted a total of 62,757 prerecorded calls to Plaintiff and Class members during a ten-month period in 2017.

41.     The goal of Defendants sending these prerecorded calls to consumers was to encourage them to visit Braman's dealership for the purpose of selling them vehicles, which was, in fact, successful as Braman generated consumer leads from the prerecorded call campaigns.

**Stratics' Role in Transmitting the RVMs**

42.     Stratics knowingly provided Braman and Major an avenue and means, through a platform, to transmit the subject prerecorded messages to class members.  Further, Stratics has direct knowledge of, and the right of control of, the complained about conduct alleged herein, as the subject prerecorded messages are transmitted only after the violative prerecorded messages are uploaded and stored on the Stratics platform.

43.     Stratics also maintains robust records demonstrating that the subject prerecorded messages were transmitted.

44.     Stratics also knowingly partakes in the violative conduct by allowing customers, like Braman, to transmit an unlimited amount of RVMs without ever taking steps to confirm that customers are complying with the TCPA.[7]

**The TCPA Regulates "Ringless" Voicemails**

45.     "Ringless" voicemail technology was created, and is presently being used by unscrupulous companies, including Defendants, in an attempt to circumvent the TCPA.

---

[7]     *See supra* n.6.

46.     Unfortunately for Defendants, the TCPA regulates "ringless" voicemail, and they are liable under the TCPA for invading consumers' privacy rights by utilizing such technology when engaging in their telemarketing practices.  *See Schaevitz v. Braman Hyundai, Inc.*, No. 1:17-cv-23890-KMM, 2019 U.S. Dist. LEXIS 48906, at *14-15 (S.D. Fla. Mar. 25, 2019) (Moore, J.) ("[a] construction of the TCPA in which a 'ringless' voicemail is a 'call' is consistent with Congress's purpose in enacting the TCPA."); *see also Saunders v. Dyck O'Neal, Inc*., 319 F. Supp. 3d 907, 911(W.D. Mich. July 17, 2018) ("By leaving a voicemail directly in the server space associated with Saunders' phone, Dyck O'Neal was attempting to communicate with Saunders" and thus the "use of direct to voicemail technology is a 'call' and falls within the purview of the TCPA.").

47.     "Ringless" voicemail technology works by delivering the same prerecorded messages *en masse* to the voicemail boxes of cellular subscribers.

48.     However, calls made by utilizing this technology are not actually "ringless" since the prerecorded message that results triggers an audible notification to the consumer once the message is received by default.

49.     Further, the method by which "ringless" voicemails are transmitted to cellular telephones is essentially the same as the method for transmitting text messages to cellular phones. This is significant because consumers are entitled to the same consent-based protections for text messages as they are for voice calls to wireless numbers.  *See Satterfield*, 569 F.3d at 952 (noting that the FCC has determined that a text message falls within the meaning of "to make any call" in 47 U.S.C. § 227(b)(1)(A)); *Toney v. Quality Res., Inc*., 75 F. Supp. 3d 727, 734 (N.D. Ill. 2014) (holding that the defendant bears the burden of showing that it obtained a plaintiff's prior express consent before sending her a text message).

50.     As illustrated below, "ringless" voicemails, including the prerecorded messages at issue in this case, are delivered just like text messages by "establishing a direct Internet-based computer-to-computer data connection to the respective voicemails systems of the cellular carries. As part of the protocol for this data communication, subscribers' cellular telephone numbers are used to identify each voicemail box so that the pre-recorded voice messages are inserted into each voicemail box *en masse.*"[8]



51.     Unlike robocalls and text messages, however, consumers are left powerless to block "ringless" voicemails from being transmitted to their phones. Thus, a consumer's voicemail box could be rendered useless by just a handful of companies using the technology to market their businesses.

---

[8]     Comments Opposing the Petition for Declaratory Ruling and Waiver by National Consumer Law Center, *In re Rules & Regulations Implementing the Tel. consumer Prot. Act of 1991*, CG Docket No. 02-278, DA 17-364 (FCC May 18, 2017), https://www.fcc.gov/ecfs/filing/105180243621422.

52.     The purpose of a "ringless" voicemail is to communicate with or try to get into communication with a consumer through the consumer's cellular telephone.

53.     Indeed, it is precisely because consumers are unable to block "ringless" voicemails that Stratics, the company utilized by Braman and Major to violate the TCPA, advertises that "ringless" voicemails have the highest consumer connection rate over any other technology:[9]





54.     The FCC has previously rejected the argument that technologies such as "ringless" voicemails are not regulated by the TCPA because they are not traditional "calls."  Particularly, in the context of Internet-to-phone text messaging, which is essentially the same technology at issue in this case, the FCC has ruled:

> From the recipient's perspective, Internet-to-phone text messaging is functionally equivalent to phone-to-phone text messaging, which the Commission has already confirmed falls within the TCPA's protection. And the potential harm is identical to consumers; unwanted text messages pose the same cost and annoyance to consumers, regardless of whether they originate from a phone or the Internet. Finding otherwise—that merely adding a domain to the telephone number means the number has not been "dialed"—when the effect on the recipient is identical, would elevate form over substance, thwart Congressional intent that evolving

---

[9]     *See supra* n.6.

technologies not deprive mobile consumers of the TCPA's protections, and potentially open a floodgate of unwanted text messages to wireless consumers.[10]

55.   Tellingly, Stratics itself admits, and warned Defendants, that the TCPA regulates this type of telemarketing technology:[11]

**Are Ringless Voicemails exempt from all the FCC rules?**

No, they are not, and Stratics Networks takes the approach that Ringless Voicemail Drops must be used responsibly at ALL times. Although voicemail technology is not regulated the same way as, say, a robocall there are ALWAYS rules that must be followed when using RVM.

**Are Ringless Voicemail Drops exempt from all TCPA rules?**

No, they are not, and Stratics Networks takes the approach that Ringless Voicemail Drops must be used responsibly at ALL times. Although voicemail technology is not regulated by TCPA the same way as, say, a robocall there are ALWAYS rules that must be followed when using RVM.
The TCPA also has several rules in place governing the content of voicemail messages.

**Can Ringless Voicemail Drops protect you from lawsuits?**

No, people can sue you for anything, so it is very important to use Ringless Voicemail Drops responsibly at ALL times. This includes, but is not limited to, scrubbing messages against the NDNC list, providing an opportunity for people to opt-out of future messages and always clearly identifying yourself when leaving a voicemail.

**Do Ringless Voicemail Drops have any rules associated with them?**

Yes, it is very important to use Ringless Voicemail Drops responsibly at ALL times. This includes, but is not limited to, scrubbing messages against the NDNC list, providing a opportunity for people to opt-out of future messages and always clearly identifying yourself when leaving a voicemail.

## Failed FCC "Ringless" Voicemail Petition

56.   On January 9, 2017, a putative class action lawsuit under the TCPA was filed against TT of Pine Ridge, Inc. ("TT of Pine Ridge"), a vehicle dealership located in Naples, Florida, styled *Mahoney v. TT of Pine Ridge, Inc.*, Case No. 9:17-cv-80029-DMM (S.D. Fla. 2017) ("*Mahoney*").

57.   At issue in *Mahoney* was the use of Stratics' voicemail platform by TT of Pine Ridge to promote its dealership's inventory and related services.  [*See id*. at ECF No. 1].

---

[10]   *See Rules & Regulations II*, 30 FCC Rcd. at 8020.

[11]   *See* Stratics Networks, Ringless Voicemail Drops FAQ, https://straticsnetworks.com/faq-for-ringless-voicemail-drops-by-stratics-networks (last visited June 5, 2019).  In fact, until recently, Stratics even referred to its Ringless Voicemail Drops as "calls" on its website when describing and marketing the technology to potential customers.

58.     On March 31, 2017, All About the Message, LLC, a distributor for Stratics' ringless

voicemail platform, filed a Petition for Declaratory Ruling with the FCC seeking a declaration that

the TCPA does not apply to "ringless" voicemails (the "FCC RVM Petition").  The FCC RVM

Petition appears to have been initiated and/or coordinated by TT of Pine Ridge as a Motion for

Stay pending resolution of the FCC RVM Petition was filed on the same day by TT of Pine Ridge

in the *Mahoney* lawsuit.  [*See id.* at ECF No. 33].

59.     The  FCC  RVM  Petition  received  significant  media  attention,[12]  and  fierce

opposition by members of Congress, State Attorney Generals, and consumer protection groups,

including the National Consumer Law Center.

60.     For example, several members of Congress wrote a letter to the Chairman of the

FCC describing "ringless" voicemails as "a clear-cut attempt at an end-run around legal and

technological protections against spam and unwanted phone communications."[13]

61.     Similarly, the Attorney Generals for Massachusetts, New York, and Kentucky filed

an opposition to the FCC RVM Petition stating in pertinent part:

> Ringless voicemails are prerecorded calls within the meaning of the TCPA. All
> About the Message seeks to avoid this conclusion by stating that ringless voicemail
> "bypasses the wireless telephone and telephone subscriber altogether," and by
> narrowly construing its conduct to include only the delivery of the voicemail

---

[12]  *See, e.g.*, Sarah Shemkus, *You can sound off to the FCC about 'ringless voice mail'*, BOSTON
GLOBE  (May  24,  2017),  https://www.bostonglobe.com/business/2017/05/24/you-can-sound-off-
fcc-about-ringless-voicemail/buOKWDgr06Fxb1m0qk2ZCK/story.html and Tara Siegel Bernard,
*No, Your Phone Didn't Ring. So Why Voice Mail From a Telemarketer?* NY TIMES (June 3, 2017),
https://www.nytimes.com/2017/06/03/business/phone-ringless-voicemail-fcc-telemarketer.html.

[13]  *See* Correspondence from Members of Congress to the Honorable Ajit Pai, Chairman, FCC
(June 21, 2017),https://www.fcc.gov/ecfs/filing/1072811351675.

message to a server and not to the consumer. This is a distinction without a difference.[14]

62.     Ultimately, on June 20, 2017, the FCC RVM Petition was withdrawn after a class-wide settlement was reached in *Mahoney*, and the FCC did not issue a ruling with respect to the petition.

63.     Upon information and belief, Defendants were aware of the FCC RVM Petition and its withdrawal prior to sending the subject prerecorded telemarketing calls to Plaintiff and members of the Class.

**Facts Specific to Plaintiff**

64.     On or about April 18, 2017, Major, on behalf of Braman, using Stratics' calling platform, transmitted a prerecorded telemarketing call to Plaintiff's cellular telephone number ending in 5361 (the "5361 Number").

65.     Defendants transmitted the prerecorded telemarketing call to Plaintiff and others to convince them to visit Braman's dealership, at which point Braman would attempt to sell a vehicle to these consumers.

66.     The prerecorded telemarketing call was transmitted to Plaintiff's cellular telephone, and within the time frame relevant to this action.

67.     Defendants' prerecorded telemarketing call constitutes telemarketing because it encouraged the future purchase or investment in property, goods, and/or services, *i.e.*, a vehicle from Braman's inventory and related services.

---

[14]     Comments Opposing the Petition for Declaratory Ruling and Waiver by Massachusetts, New York, and Kentucky, *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278 (FCC June 2, 2017),https://www.fcc.gov/ecfs/filing/10602714924246.

68.     The prerecorded telemarketing call originated from a telephone number owned and/or operated by or on behalf of Defendants.

69.     Plaintiff received the subject prerecorded telemarketing call within this District and, therefore, Defendants' violation of the TCPA occurred within this District.  Defendants caused other prerecorded telemarketing calls to be sent to individuals residing within this District as well.

70.     At no point in time did Plaintiff provide Defendants with her express written consent to be contacted with a prerecorded voice.

71.     Plaintiff is the subscriber and sole user of the 5361 Number, and is financially responsible for phone service to the 5361 Number.

72.     Defendants' unsolicited prerecorded message caused Plaintiff actual harm, including invasion of her privacy, aggravation, annoyance, intrusion on seclusion, trespass, and conversion. Defendants' prerecorded message also inconvenienced Plaintiff and caused disruption to her daily life.  *See Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 305-06 (7th Cir. 2017), *cert. denied*, 137 S. Ct. 2321 (2017) ("Every call uses some of the phone owner's time and mental energy, both of which are precious.").

## CLASS ALLEGATIONS

### Proposed Class

73.     Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23, on behalf of herself and all others similarly situated.

74.     Plaintiff brings this case on behalf of a Class defined as follows:

All persons within the United States who, within the four years prior to the filing of this Complaint, were sent a prerecorded message, from Defendants or anyone on Defendants' behalf, to said person's cellular telephone number, without emergency purpose and without the recipient's prior express written consent.

75.     Excluded from the Class are Defendants, their officers, directors, affiliates, legal representatives, employees, successors, subsidiaries and assigns, as well as the judge and court staff to whom this case is assigned.  Plaintiff reserves the right to amend the Class definition if discovery of further investigation reveals that the Class should be modified.

### Numerosity

76.     Upon information and belief, Defendants have transmitted prerecorded telemarketing calls to cellular telephone numbers belonging to over 60,000 consumers throughout the United States without their prior express written consent.  The members of the Class, therefore, are believed to be so numerous that joinder of all members is impracticable.

77.     The exact number and identities of the Class members can and will be ascertained through discovery.  Identification of the Class members is a matter capable of ministerial determination from Defendants' call records.

### Common Questions of Law and Fact

78.     There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether Defendants made non-emergency prerecorded telemarketing calls to Plaintiff's and Class members' cellular telephones;

(b)     Whether Defendants can meet their burden of showing that they obtained prior express written consent to make such calls; and

(c)     Whether Defendants are liable for damages, and the amount of such damages.

79.     The common questions in this case are capable of having common answers.  If Plaintiff's claim that Defendants routinely transmit prerecorded telemarketing calls to telephone

numbers assigned to cellular telephone services is accurate, Plaintiff and the Class members will have identical claims capable of being efficiently adjudicated and administered in this case.

### Typicality

80.     Plaintiff's claims are typical of the claims of the Class members, as they are all based on the same factual and legal theories.

### Adequacy

81.     Plaintiff is a representative who will fairly and adequately represent and protect the interests of the Class because she shares common interests with Class members as a result of Defendants' misconduct.

82.     In addition, Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including those involving violations of the TCPA.  Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other respective members of the Class and have the financial resources to do so.  Neither Plaintiff nor her counsel have any interests adverse to those of the other members of the Class.

### Proceeding Via Class Action is Superior and Advisable

83.     A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable.  While the aggregate damages sustained by the Class are in the millions of dollars, the individual damages incurred by each member of the Class resulting from Defendants' wrongful conduct are too small to warrant the expense of individual lawsuits.  The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

84.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants.   For example, one court might enjoin Defendants from performing the challenged acts, whereas another may not.   Additionally, individual actions may be dispositive of the interests of the Class, although certain Class members are not parties to such actions.

## COUNT I

### Violations of the TCPA, 47 U.S.C. § 227(b)
### (On Behalf of Plaintiff and the Class)

85.     Plaintiff re-alleges and incorporates the foregoing allegations as if fully set forth herein.

86.     It is a violation of the TCPA to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service …." 47 U.S.C. § 227(b)(1)(A)-(A)(iii).

87.     Major – at the direction of Braman – transmitted calls using an artificial or prerecorded voice to the cellular telephone numbers of Plaintiff and members of the  Class, using the Stratics platform.

88.     These calls were made without regard to whether Defendants had first obtained express written permission from the called party to make such calls.   In fact, Defendants did not have prior express written consent to call the cellphones of Plaintiff and the other members of the Class when their calls were made.

89.     Defendants have, therefore, violated § 227(b)(1)(A)(iii) of the TCPA by using an artificial or prerecorded voice to make non-emergency telephone calls to the cell phones of Plaintiff and the other members of the Class without their prior express written consent.

90.     As a result of Defendants' conduct and pursuant to § 227(b)(3) of the TCPA, Plaintiff and the other members of the Class were harmed and are each entitled to a minimum of $500.00 in damages for each violation.

**WHEREFORE**, Plaintiff, on behalf of herself and the other members of the Class, prays for the following relief:

A.     A declaration that Defendants' practices described herein violate the TCPA;

B.     An award of actual and statutory damages; and

C.     Such further and other relief the Court deems reasonable and just.

## JURY DEMAND

Plaintiff and the Class members hereby demand a trial by jury.

Date: June 6, 2019

Respectfully submitted,

**ROBBINS GELLER RUDMAN
 & DOWD LLP**

*/s/ Mark J. Dearman*
Mark J. Dearman
Florida Bar No. 982407
mdearman@rgrdlaw.com
Jason H. Alperstein
Florida Bar No. 64205
jalperstein@rgrdlaw.com
Eric S. Dwoskin
Florida Bar No. 112459
edwoskin@rgrdlaw.com
120 E. Palmetto Park Road
Suite 500
Boca Raton, FL 33432-4809
Telephone: 561-750-3000
Fax: 561-750-3364

*Counsel for Plaintiff and the Class*

**SHAMIS & GENTILE, P.A.**

*/s/ Andrew J. Shamis*
Andrew J. Shamis
Florida Bar No. 101754
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 400
Miami, FL 33132
Telephone: 305-479-2299
Fax: 786-623-0915

*Counsel for Plaintiff and the Class*

**HIRALDO P.A.**

*/s/ Manuel S. Hiraldo*
Manuel S. Hiraldo
Florida Bar No. 30380
401 E. Las Olas Boulevard
Suite 1400
Ft. Lauderdale, FL 33301
mhiraldo@hiraldolaw.com
Telephone: 954-400-4713

*Counsel for Plaintiff and the Class*

**EDELSBERG LAW, PA**

/s/ *Scott A. Edelsberg*
Scott Edelsberg, Esq.
Florida Bar No. 0100537
scott@edelsberglaw.com
2875 NE 191st St #703
Aventura, FL 33180
Telephone: 305-975-3320

*Counsel for Plaintiff and the Class*